## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Tyler Schultz, on behalf of himself individually and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT JURY TRIAL DEMAND** |
| v. | |
| Bayer Cropscience LP, Bayer Cropscience, Inc., Corteva, Inc., Cargill Incorporated, BASF Corporation, Syngenta Corporation, Winfield Solutions, LLC, Univar Solutions, Inc., Federated Co-Operatives LTD., CHS Inc., Nutrien AG Solutions, Inc., Growmark Inc., Growmark ES, LLC, Simplot AB Retain Sub, Inc., and Tenkiz, Inc., | |
| Defendants. | |

## INTRODUCTION

1.      Plaintiff, Tyler Schultz, on behalf of himself individually and on behalf of all others similarly situated (the "Classes" as defined below), upon personal knowledge as to the facts pertaining to himself and upon information and belief as to all other matters, and based on the investigation of counsel, brings this class action complaint to recover injunctive relief, treble damages, and other relief as appropriate, based on Defendants Bayer CropScience, LP, Bayer CropScience, Inc., Corteva, Inc., Cargill Incorporated, BASF Corporation, Syngenta Corporation, Winfield Solutions, LLC, Univar Solutions, Inc., Federated Co-Operatives Ltd., CHS Inc., Nutrien Ag Solutions

1

Inc., Growmark Inc., Growmark FS, LLC, Simplot AB Retail Sub, Inc., and Tenkoz, Inc. (collectively, "Defendants") having violated federal and state antitrust laws, unfair competition laws, consumer protection laws, and unjust enrichment laws of the several States.

2.      Plaintiff seeks to represent classes consisting of persons and entities who purchased products used by farmers including seeds and crop protection chemicals such as fungicides, herbicides, and insecticides ("Crop Inputs") for their own use, and not for resale, in the United States.  Relevant purchases are from at least as early as January 1, 2014 through the present (the "Class Period"), from the Defendants, or through Defendants' authorized retailers for which Defendants charged supracompetitive prices due to their collusion and conspiracy.

## NATURE OF ACTION

3.      Defendants represent a vertically integrated supply chain for Crop Inputs and this action arises from an unlawful agreement between Defendants to artificially increase and fix the prices of these products.

4.      Defendants Bayer CropScience, Inc., Corteva, Inc., Syngenta Corporation, and BASF Corporation (the "Manufacturer Defendants"), together with Defendants Cargill Incorporated, Winfield Solutions, LLC, Univar Solutions, Inc. (the "Wholesaler Defendants"), and Defendants CHS Inc., Nutrien Ag Solutions Inc., Growmark Inc., Simplot AB Retail Sub, Inc., Tenkoz Inc., and Federated Co-Operatives Ltd. (the "Retailer Defendants"), have established a secretive distribution process that keeps Crop Inputs prices inflated at supracompetitive levels.  In furtherance of their conspiracy,

Defendants have restricted and denied farmers access to relevant market information that would allow for comparison shopping and better-informed purchasing decisions, as well as denying Plaintiff and the Classes information about seed relabeling practices that would inform farmers as to whether they are buying newly developed seeds or identical seeds repackaged under a new brand name and sold for a higher price.

5.      The cost of Crop Inputs continues to rise, but neither the cost increases nor the price disparities are attributable to any independent legitimate cause, such as weather or other factors.

6.      Initiatives were undertaken, as early as 2014, to provide new online Crop Inputs sales platforms and to offer pricing comparison tools that would allow farmers to view what other farmers were paying for the same Crop Inputs, increasing price transparency. These online sales platforms, including Farmers Business Network ("FBN") and AgVend Inc., became useful to and successful with farmers.

7.      In order to keep prices supracompetitively high, and to the detriment of farmers, Defendants conspired and coordinated to boycott these online Crop Inputs sales platforms.  These online tools and sales platforms posed a threat to Defendants' market position and price control.

8.      For example, the Manufacturer Defendants and Wholesaler Defendants agreed amongst themselves not to sell Crop Inputs to FBN and enforced strict discipline on Retailer Defendants who failed to comply with the boycott. Defendants Syngenta, Bayer, BASF, and Corteva used audits and inspections of their authorized retailers to

ensure that online Crop Inputs sales platforms were unable to obtain Crop Inputs from their authorized retailers, resulting in higher prices to consumers.

9.    Defendants' conspiracy and boycott served its intended purpose. Online Crop Inputs sales platforms such as FBN and AgVend were unable to purchase Defendants' Crop Inputs in order to sell them on their platforms, which was devastating to the platforms and which directly harmed farmers by locking in captive distribution systems and eliminating a lower cost option for purchasing these Crop Inputs.

10.    As a direct and proximate result of Defendants' anticompetitive conduct, Defendants' have maintained supracompetitive prices for Crop Inputs by denying farmers access to accurate pricing information and have injured farmers by forcing farmers to accept opaque price increases that drastically outweigh any increase in crop yields or market prices for the farmers' crops.

11.    Defendants' anticompetitive conduct is the subject of an ongoing investigation by the Canadian Competition Bureau ("CCB, with a Canadian federal court finding that there is sufficient evidence to require Defendants to produce records concerning their coordinated anticompetitive conduct in the United States.

12.    The Federal Trade Commission ("FTC") is likewise investigating anticompetitive conduct in the Crop Inputs market. At least one defendant, Corteva, has received a subpoena from the FTC directing it to submit documents related to Crop Inputs "in order to determine whether Corteva engaged in unfair methods of competition through anticompetitive conduct."

## JURISDICTION AND VENUE

13.     Plaintiff brings this action on behalf of the Classes under Section 16 of the
Clayton Act (15 U.S.C. § 26) to secure injunctive relief against Defendants for violating
Section 1 of the Sherman Act (15 U.S.C. § 1), and to recover actual and compensatory
damages, treble damages, interest, costs, and attorneys' fees for the injury caused by
Defendants' conduct. Plaintiff also asserts state law class claims on behalf of the Classes
to recover actual and compensatory damages, double and treble damages as permitted,
pre- and post-judgment interest, costs, and attorneys' fees for the injury caused by
Defendants' conduct.

14.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337,
and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. This Court also has
jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332(d) and
1367, in that: (i) this is a class action in which the matter or controversy exceeds the sum
of $5,000,000, exclusive of interest and costs, and in which some members of the
proposed Classes are citizens of a state different from some defendants; and (ii)
Plaintiff's state law claims form part of the same case or controversy as their federal
claims under Article III of the United States Constitution.

15.     Venue is proper in this Court pursuant to Sections 4, 12, and 16 of the
Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. § 1391(b), (c) and (d), because one or
more Defendants resided or transacted business in this District, is licensed to do business
or is doing business in this District, and because a substantial portion of the affected
interstate commerce described herein was carried out in this District.

16.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, shipped, sold, or delivered substantial quantities of Crop Inputs throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and engaged (d) in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

17.     The activities of Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial, and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## <u>TRADE AND COMMERCE</u>

18.     This action involves the markets for Crop Inputs in the United States, including the manufacture of Crop Inputs, the wholesale market for Crop Inputs, and the retail sales market for Crop Inputs.

19.     During the Class Period, each Defendant sold Crop Inputs in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial District.

20.     During the Class Period, Defendants collectively controlled a majority of the market for Crop Inputs in the United States.

21.     Defendants' business activities substantially affected interstate trade and commerce in the United States and caused injury in the United States.

## PARTIES

**Plaintiff**

22.     Plaintiff Tyler Schultz was a resident of the state of Minnesota at all times relevant to this conspiracy. During the Class Period, and while residing in Minnesota, Plaintiff Schultz purchased one or more Crop Inputs, for his own use and not for resale, that were manufactured or sold by one or more Defendants. Plaintiff suffered injury as a result of Defendants' conduct alleged herein.

**Manufacturer Defendants**

23.     Bayer AG is a multinational pharmaceutical, chemical, and agriculture company. It organizes itself into four divisions, each with its own management and corporate organization. Legal entities within each division work together, follow a common strategy, and report up to the same level of management.

24.     Defendant Bayer CropScience Inc. is a wholly-owned subsidiary of Bayer AG headquartered in St. Louis, Missouri and incorporated in New York that develops, manufactures, and sells Crop Inputs in the United States.

25.     Defendant Bayer CropScience LP is a wholly-owned subsidiary of Bayer AG headquartered in Research Triangle Park, North Carolina, and is a crop science company that sells Crop Inputs in the United States.

26.     Bayer CropScience Inc. and Bayer CropScience LP both operate as part of the Bayer Group's Crop Science division.

27.     Defendant Corteva Inc. is a domestic corporation headquartered in Wilmington, Delaware, that develops, manufactures, and sells Crop Inputs in the United States.

28.     Defendant BASF Corporation is headquartered in Florham Park, New Jersey, and is the principal U.S.-based operating entity and largest subsidiary of BASF SE, a multinational pharmaceutical, seed, and chemical company. BASF develops, manufactures, and sells Crop Inputs in the United States.

29.     Defendant Syngenta Corporation is the main U.S.-based operating subsidiary of Syngenta AG, and is headquartered in Wilmington, Delaware. Syngenta develops, manufactures, and sells Crop Inputs in the United States.

**Wholesaler Defendants**

30.     Defendant Cargill, Inc. is a domestic corporation headquartered in Minnetonka, Minnesota. Cargill owns and operates a wholesaler AgResource Division, which distributes Crop Inputs to Cargill's retail network and to retailers. Cargill's AgResource Division maintains contracts with Bayer, Corteva, BASF, and Syngenta entitling it to purchase and distribute branded Crop Inputs and entitling it to special rebates.

31.     Defendant Winfield Solutions, LLC ("Winfield United") is a domestic corporation headquartered in Arden Hills, Minnesota and incorporated in Delaware.

Winfield United is a Crop Input wholesaler. It maintains contracts with Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Winfield United is also a major Crop Input retailer that operates as a cooperative owned by its members, which are 650 Crop Input retail businesses operating 2,800 retail locations throughout the United States and parts of Canada.

32.     Defendant Univar Solutions, Inc. is a Crop Input wholesaler. Univar maintains contracts with Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Univar Solutions, Inc. is a domestic corporation headquartered in Illinois and incorporated in Delaware.

**Retailer Defendants**

33.     Defendant CHS Inc. is one of the largest crop input wholesalers in the United States. Like many large wholesalers, it also operates retail networks bearing the CHS brand around the country that sell Crop Inputs from brick-and-mortar stores. CHS Inc. is incorporated and headquartered in the state of Minnesota.

34.     CHS and the retail networks it operates maintain contracts with Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

35.     Defendant Nutrien Ag Solutions, Inc. is both a Crop Input wholesaler and the largest Crop Input retailer in the United States. It sells Crop Inputs to farmers throughout the country and maintains contracts with Bayer, Corteva, BASF, and

Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Nutrien Ag Solutions, Inc. is incorporated in Delaware and has its principal place of business in Colorado.

36.     Defendant GROWMARK, Inc. d/b/a Farm Supply or FS, is a large Crop Input retailer headquartered in Illinois, with brick-and-mortar locations throughout the Midwestern United States. Growmark is incorporated in Delaware. Growmark maintains contracts with Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs, and entitling it to special rebates.

37.     Defendant Tenkoz Inc. is one of the largest Crop Input retailers in the United States. Tenkoz purchases and sells 25% of all crop protection chemicals sold in the United States annually through 550 retail locations and 70 wholesale locations around the country. Tenkoz is incorporated and headquartered in Georgia. Tenkoz maintains contracts with Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

38.     Defendant Simplot AB Retail Sub, Inc. f/k/a Pinnacle Agriculture Distribution, Inc. is a large Crop Input wholesaler and retailer that operates 135 retail locations across 27 states. Simplot is headquartered and incorporated in Mississippi. Simplot maintains contracts with Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

39.     Defendant Federated Co-operatives Ltd. is a large Crop Input retailer. It maintains contracts with Bayer, Corteva, BASF, and Syngenta authorizing it to purchase

and distribute Crop Inputs and entitling it to special rebates. Federated is under investigation by the Canadian Competition Bureau for engaging in coordinated anticompetitive practices designed to exclude competition in the Crop Input market.

## FACTUAL ALLEGATIONS

40.     Operating expenses, of which Crop Inputs represent a substantial portion, have been increasing dramatically for U.S. farmers, while revenue and profits for their crop yields remain stagnant. Between 1995 and 2011, the cost of growing soybeans and corn has tripled, while yields for those same crops rose by only 18.9% and 29.7% respectively.

41.     This trend has continued in recent years. According to one study, seed, fertilizer, and pesticide costs have risen from 32% of crop revenue between 1990 and to 48% of crop revenue in 2015.[1]  This increase in the weight of costs attributable to Crop Inputs is not attributable to any legitimate cause, as research and development expenditures have decreased over the past several years, and in fact should have been expected to remain stable, or decrease, in a competitive market.

42.     The Defendants have constructed the markets for Crop Inputs to be opaque so as to obscure for farmers the pricing data and product information needed to make informed purchasing decisions about Crop Inputs.  The market structure imposed by the

---

[1] Schnitkey, G. and S. Sellars. "Growth Rates of Fertilizer, Pesticide, and Seed Costs over Time." *farmdoc daily* (6):130, Department of Agricultural and Consumer Economics, University of Illinois at Urbana-Champaign, July 12, 2016, https://farmdocdaily.illinois.edu/2016/07/growth-rates-of-fertilizer-pesticide-seed-costs.html.

Defendants leads farmers to pay higher prices for Crop Inputs than they would in a competitive market. On top of this, farmers are unable to buy Crop Inputs without paying for the unnecessary overhead of brick-and-mortar retailers.

43.     The Manufacturer Defendants, who develop and produce between 75% to 90% of the most popular name brand Crop Inputs, guard their product prices from consumers. The Manufacturer Defendants allow their products to be sold only by wholesalers, including the Wholesaler Defendants, retailers owned or operated by the manufacturer, and licensed "authorized retailers," such as the Retailer Defendants, exerting substantial control on the methods of providing products and pricing.

44.     "Authorized retailers" are subject to license agreements that include strict confidentiality provisions prohibiting the disclosure of the manufacturers' prices or any incentives, rebates, or commissions offered by the manufacturers to the authorized retailers.

45.     Retail pricing is purposefully opaque and obscured. Retailers are prohibited from disclosing the price paid to the wholesaler for Crop Inputs or the price at which retailers sell those exact same Crop Inputs to other farmers. In addition, retailers sell Crop Inputs bundled together with related services, such as spraying or applying chemicals, to make it more difficult for farmers to ascertain the true cost of any individual Crop Input or bundled service.

46.     Manufacturers takes further advantage of farmer's lack of access to objective product data through "seed relabeling," which is the taking of seeds that have

long been on the market and repackaging the exact same seeds under a new brand name so that they can be sold at a higher price. This practice leads to overpaying for seed that could have been purchased for less from a different brand.  There is also another downside to this—farmers will have less genetic diversity in seeds across their farms than they anticipated.

**Alternative Sales Platforms**

47.     Attempts to modernize the Crop Inputs market, making it more efficient and transparent, included the launch in 2014 of independent online Crop Inputs sales platforms.  Among the effects of these efforts was increased price transparency and access to Crop Inputs directly from the Manufacturer Defendants. These online marketplaces sought to avoid the opaque and inefficient distribution system consisting of Wholesaler and Retailer Defendants that led to supracompetitive prices.

48.     These online Crop Inputs sales platforms were initially popular and successful. For example, more than 12,000 farmers signed up for FBN's service that provided objective performance data on Crop Inputs, and 6,000 farmers signed up for FBN's electronic sales platform.

**The Response.**

49.     Wholesaler and Retailer Defendants recognized that these online sales platforms threatened the opacity of the Crop Inputs markets, and therefore were a danger to their market position and profit margins beyond just the lost sales represented by these new channels.

50.     In 2016, Defendant Bayer formed an internal task force to study the long-term competitive impact of FBN's online platform.

51.     A report published by CoBank, a cooperative partly owned by Crop Inputs retailers and a major lender to grain cooperatives, explained that price transparency would enable farmers to negotiate with Crop Inputs retailers and decrease their profit margins:

> Despite relatively low sales, e-commerce companies pose a threat to brick-and-mortar ag retailers in two ways. First, any new competitor will erode sales and margins to some degree and second, e-commerce sites increase transparency for product prices.

> These e-commerce sites provide farmers with several sources of product price information that are just clicks away. Farmers can then leverage that information in negotiations with local brick-and-mortar retailers. Traditional ag retailers that bundle products and services together under the product price are losing some customers to e-commerce sites that provide only the product. The e-commerce channel allows cost-sensitive farmers to eliminate service costs like custom application and product warranties.[2]

52.     Defendant CHS, upon learning of FBN's online buying platform launch in 2016, sent a letter to farmers discouraging them from using FBN by falsely claiming that although FBN would be able to offer the same products at lower costs, "FBN just does it with little overhead and without returning any profits to you the farmer, while lining the pockets of investors and big data companies like Google."

53.     CropLife America is a trade association made up of major Crop Inputs manufacturers, wholesalers, and retailers, and serves as an ideal vehicle for collusion.

---

[2] *Ag Retailers Look to Retool Strategy for Success in the Era of E-Commerce*, COBANK (Feb. 20, 2019), https://www.cobank.com/corporate/news/ag-retailers-look-to-retool-strategy-for-success.

CropLife America's board of directors is chaired by an executive from one of the Manufacturer Defendants, currently Paul Rea from BASF and previously Suzanne Wasson from Corteva. For the 2016-19 term, CropLife America's board of directors included executives from Defendants Bayer, CHS, Growmark, Tenkoz, and Simplot. There is not a single representative for farmers or farmer groups on CropLife America's board of directors, despite CropLife America's mission to "help ensure growers and consumers have the technologies they need to protect crops, communities, and ecosystems from the threat of pests, weeds, and diseases in an environmentally sustainable way."

54.     CropLife America publishes the trade publication CropLife Magazine, which repeated the concerns expressed by CoBank about the threat posed by online Crop Inputs sales platforms to Crop Inputs retailers' business and their ability to charge supracompetitive prices.  Rather than appreciate the value to consumers of transparency, market efficiency and lower input costs for farmers, CropLife stated it was "concerned that the retailer could be disintermediated—i.e., that electronic platforms would 'cut out the middle man'—allowing growers to find product conveniently and at a lower market price," and decried the "devil known as 'price transparency,'" stating that "[g]rowers were not really as interested in buying and selling and storing product as they were in printing price lists off the Internet and waving them in their retailer's faces. Already low margins were about to race to the bottom."

55.     CropLife's PACE Advisory Council—a committee composed of the "heads of major ag retailers, market suppliers, equipment makers, and other agricultural

analysts"—clearly identified the threat posed by online sales platforms to retailers and wholesalers at its 2017 annual meeting. CropLife's coverage of the event reported that "three letters . . . continually cropped up no matter what the topic of conversation happened to be – FBN (Farmers Business Network). To say that all things related to FBN and its business practices dominated much of the day-long event would be a gross understatement. Several members of the PACE Council described how FBN had negatively affected their business during 2017 by cutting into their already slim margins on various products."

56.     The Retailer Defendants and the Wholesaler Defendants conspired to eliminate the platforms' product supply in order to maintain their market position. To do so, the Retailer and Wholesaler Defendants pressured the Manufacturer Defendants— who rely on the Wholesaler and Retailer Defendants to recommend and sell their products to farmers—to cut off FBN's supply of Crop Inputs.

57.     The Manufacturer Defendants complied with the demands of the Wholesaler and Retailer Defendants to cut off FBN's supply, and Defendants initiated a joint boycott of online sales platforms, including FBN. When FBN attempted to purchase Crop Inputs from the Manufacturer and Wholesaler Defendants, they all refused and offered only pretextual excuses for their refusal.

58.     For example, when Syngenta's Head of Crop Protection Sales in the United States found out that a small number of branded Crop Inputs had been sold on online platforms in violation of Defendants' boycott, he falsely claimed that online platforms would deliver counterfeit products and that, "[w]hen online entities acquire products from

sources other than authorized dealers or contracted distributors, you'd better question and be concerned about the quality."

59.     To ensure the success of Defendants' boycott and maintain supracompetitive pricing, Defendants penalized retailers who failed to freeze out the online platforms. For example, Syngenta initiated an audit of its authorized retailers after learning that some retailers had sold Crop Inputs product to FBN despite the boycott in order to identify and punish the retailers who made those sales to FBN.

60.     Defendants Bayer, BASF, and Corteva utilize mandatory language in their form contracts with authorized retailers that permit audits of authorized retailers' books and records and on-site inspections at any time. Defendants Bayer, BASF, and Corteva used these contractual provisions to ensure that online sales platforms could not purchase branded Crop Inputs from an authorized retailer.

61.     The impact of Defendants' boycott extended past branded product to generic products (i.e., Crop Inputs sold by non-Defendant manufacturers after the Manufacturer Defendants' patents expire). In a 2018 Forbes article, the CEO of a generic chemical products company stated it was wary of supplying FBN because it could anger existing sales channels, and that "[i]n an ideal world, if I could flip the switch and sell to these guys, I would do it in a heartbeat."[3]

---

[3] Amy Feldman, *This Scrappy Startup Wants to Save Family Farms. But Big Ag Is Fighting Back*, FORBES (June 19, 2018 10:00 AM), https://www.forbes.com/sites/amyfeldman/2018/06/19/farming-ag-agriculture-farmers-business-network/?sh=246579466312.

62.     FBN also purchased Yorkton, a Canada-based retailer with longstanding supply agreements with Defendants Bayer, Syngenta, BASF, Corteva, and Winfield, which would have provided FBN with inventory of Crop Inputs to sell to farmers—but for the intervention of the Wholesaler and Retailer Defendants, which threatened to retaliate against the Manufacturer Defendants if they maintained those agreements. As a result, the Manufacturer Defendants also boycotted Yorkton, cancelling their longstanding supply contracts within a few months of FBN's March 2018 acquisition of Yorkton.

63.     Defendants were at least transparent about their aim to eliminate the threat to the maintenance of supracompetitive prices, with Defendant Univar stating in an email dated April 6, 2018, after FBN purchased Yorkton, that the intent in boycotting Yorkton was to maintain profit margins at levels above what the new market would bear.

64.     Univar stated in this email that it had informed FBN that it would cease to do business with FBN after July 31, 2018, and that "FBN is a data company that wants to collect and aggregate data to eventually sell for a profit to companies that will use the data to make farmers grow us food for nothing. . . . If anyone thinks socialism is going to feed the world just call Russia first and see how that worked out." The Univar email also criticized FBN's model of transparency, stating that "[m]argin compression is not the way to a brighter future and that is all FBN is currently offering."  The intended result was higher prices to farmers.

65.     FBN co-founder Charles Baron stated that the response by the Canadian industry after its purchase of Yorkton was similar to the United States' industry response when FBN first launched in 2014, and that "[t]hese actions caused serious harm and really blocked FBN from being able to provide and fulfill a lot of the basic services we provide growers."

66.     The Defendants' boycott of FBN was successful and caused FBN to begin developing its own products that it can sell to farmers through its online marketplace.

67.     Defendants' boycott also applied to AgVend leading AgVend to shut down its online platform and establish web-based storefronts for traditional brick-and-mortar retailers.

68.     As a result of the Defendants' coordinated boycott, without which Defendants' behavior would not be explainable, farmers are and have been deprived of the opportunity to purchase Crop Inputs at transparent, competitive prices from online platforms. Instead, farmers are forced to continue paying artificially inflated prices for Crop Inputs purchased from local retailers subject to Defendants' confidentiality requirements and seed relabeling practices.

69.     The Canadian Competition Bureau ("CCB") is formally investigating Defendants for collusion under Section 10 of the Competition Act Canada (R.S.C., 1985, c. C-34). The CCB inquiry is focused on the conduct of Federated Co-operatives Limited, Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Corteva Inc. and/or its affiliates, and Bayer CropScience Inc. and its wholly-owned

subsidiary Monsanto Canada ULC in the seed and crop protection markets, and whether those entities engaged in practices reviewable under Part VIII of the Competition Act Canada.

70.     The United States Federal Trade Commission ("FTC") and the Canadian Competition Bureau ("CCB") are investigating potential anticompetitive conduct in the Crop Inputs market. On February 11, 2020, a Canadian federal court granted in full *ex parte* applications made by Canada's Commissioner of Competition for the production of records against Cargill Limited, Winfield United Canada ULC, Univar Canada Limited, BASF Canada Inc., Bayer CropScience Inc. and its wholly-owned subsidiaries Monsanto Canada ULC and Production Agriscience Canada Company, Pioneer Hi-Bred Canada Company and Dow Agrisciences Canada Inc. relating to those practices. On May 26, 2020, the FTC issued a subpoena to Defendant Corteva, directing it to submit documents pertaining to potential anticompetitive conduct with respect to Crop Inputs.

## ANTITRUST INJURY

71.     Defendants' anticompetitive conduct has had the following effects, among others:

   a.  Price competition has been restrained or eliminated with respect to Crop Inputs;

   b.  The prices of Crop Inputs have been fixed, raised, stabilized, or maintained at artificially inflated levels;

   c.  Purchasers of Crop Inputs have been deprived of free and open competition; and

   d.  Purchasers of Crop Inputs, including Plaintiff, paid artificially inflated prices.

72.     During and throughout the Class Period, Plaintiff and Class members purchased Crop Inputs in the United States, for their own use and not for resale, that were manufactured or sold by Defendants.

73.     The purpose of the Defendants' conspiratorial and unlawful conduct was to fix, raise, stabilize, and/or maintain the price of Crop Inputs.

74.     As a direct and proximate result of the alleged violations of antitrust laws, Plaintiff and Class members have sustained injury to their business or property, having paid higher prices for Crop Inputs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were intended to punish and prevent.

## CLASS ALLEGATIONS

75.     Plaintiff brings this action on behalf of himself, and as a class action under the Federal Rules of Civil Procedure Rule 23(a) and (b) on behalf of the following classes:

    a.  All persons or entities residing in the United States that, during the Class Period, purchased from a Defendant a Crop Input manufactured by a Manufacturer Defendant; and

    b.  All persons or entities residing in the United States that, during the Class Period, purchased from a retailer other than a Retailer Defendant a Crop Input manufactured by a Manufacturer Defendant.

76.     Specifically excluded from the Classes are the following:

    a.  Persons or entities that purchased Crop Inputs solely for resale;

    b.  Defendants;

   c. The officers, directors or employees of any Defendant;

   d. Any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant;

   e. Any federal or state governmental entities;

   f. Any judicial officer presiding over this action and the members of his/her immediate family and judicial staff;

   g. Any juror assigned to this action; and

   h. Any co-conspirator identified in this action.

77. **Numerosity**. Because such information is in the exclusive control of Defendants, Plaintiff does not know the exact number of the Class members. Due to the nature of the trade and commerce involved, Plaintiff believes that there are thousands, if not tens of thousands, of members in the Classes and that they are sufficiently numerous and geographically-dispersed throughout the United States so that joinder of all Class members would be impracticable. Class treatment is the superior method for fairly and efficiently adjudicating this controversy.

78. **Class Identity**. The above-defined Classes are readily identifiable and are ones for which records should exist.

79. **Typicality**. Plaintiff's claims are typical of other Class members' claims because they were injured through Defendants' uniform misconduct and paid supracompetitive prices for Crop Inputs. Accordingly, by proving their own claims, Plaintiff will necessarily prove the other Class members' claims.

80. **Common Questions Predominate**. Common legal and factual questions exist as to all Class members. This is particularly true given the nature of Defendants'

unlawful anticompetitive conduct, which was generally applicable to the Classes as a whole. These questions include but are not limited to the following:

    a.  Whether Defendants engaged in a combination or conspiracy amongst themselves to fix, raise, maintain, and/or stabilize the prices of Crop Inputs in the United States;

    b.  The identity of additional participants in the alleged combinations and conspiracy, if any;

    c.  The duration of the alleged combination or conspiracy and nature of the acts carried out by Defendants in furtherance of the combination or conspiracy;

    d.  Whether the alleged combination or conspiracy violated Section 1 of the Sherman Act;

    e.  Whether the alleged combination or conspiracy had the effect of artificially inflating the price of Crop Inputs sold in the United States during the Class Period;

    f.  Whether the alleged conspiracy violated state antitrust, unfair competition, and/or consumer protection laws;

    g.  Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and Class members, thereby entitling Plaintiff and Class members to disgorgement of all benefits derived by Defendants;

    h.  Whether Defendants' conduct caused injury to the Class members;

    i.  Whether Defendants took actions to conceal their unlawful conspiracy;

    j.  The appropriate injunctive and related equitable relief; and

    k.  The appropriate measure and amount of damages to which Plaintiff and other Class members are entitled.

82.   **Adequacy**. Plaintiff can and will fairly and adequately represent and protect the Class members' interests and has no interests that conflict with or are antagonistic to those of the classes. Moreover, Plaintiff's attorneys are experienced and competent in antitrust and class action litigation.

83.     **Superiority**. Class action treatment is the superior procedural vehicle for the fair and efficient adjudication of the claims asserted because, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

84.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

85.     Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

### THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFF'S CLAIMS

86.     Any applicable statute of limitations for Plaintiff and the Classes has been tolled and/or Defendants are equitably estopped from asserting a statute of limitations defense by reason of Defendants' concealment of the conspiracy.

87.     Group boycotts and other antitrust violations are inherently self-concealing. Throughout the Class Period, Defendants and their co-conspirators engaged in secret conspiracies that did not reveal facts that would put Plaintiff or the Classes on inquiry notice that there was a conspiracy to fix prices of Crop Inputs, and effectively and

affirmatively concealed their unlawful combination and conspiracy from Plaintiff and the Classes.

88.     Plaintiff and Class members had neither actual nor constructive knowledge of the facts constituting their claims for relief. Plaintiff and Class members did not discover, nor could have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint, because of the deceptive practices and secrecy employed by Defendants and their co-conspirators to conceal their combination.

89.     As discussed above, the market for Crop Inputs is structured to maximize opacity in order to deny farmers access to pricing data and product information that farmers need to make informed decisions about Crop Inputs purchases. The Defendants use confidentiality provisions in their contracts to restrict disclosure of the prices of Crop Inputs. Defendants also employ seed relabeling and bundling in order to further prevent farmers, including Plaintiff and the Classes, from accessing pricing data and information about the Crop Inputs market.

90.     Plaintiff and the Classes did not have actual or constructive notice of the conspiracy alleged herein until the Canadian Competition Bureau launched its inquiry and issued subpoenas in February 2020, or until Defendant Corteva's September 2020 disclosure that the FTC had subpoenaed Corteva for documents "in order to determine whether Corteva engaged in unfair methods of competition through anticompetitive conduct."

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Conspiracy to Restrain Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1

91.     Plaintiff incorporates and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

92.     Beginning in at least 2014, and continuing thereafter to the present, Defendants, by and through their officers, directors, employees, agents, or other representatives, have explicitly or implicitly colluded to (1) artificially raise, fix, maintain, and/or stabilize prices in the Crop Inputs market, and (2) jointly boycott entities that would have introduced price-reducing electronic sales of Crop Inputs in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

93.     Defendants' actions were not mere parallel conduct but took place in the context of multiple facts evincing a conspiratorial agreement.

94.     First, the market for Crop Inputs is highly concentrated, as Defendants BASF, Corteva, Syngenta, and Bayer AG dominate production in virtually every Crop Input category, and control 85% of the corn seed market, over 75% of the soybean seed market, and over 90% of the cotton seed market. The wholesale market is just as concentrated, with seven wholesalers accounting for 70% of all sales volume.

95.     Second, an effective boycott of online sales platforms would not have been feasible without coordination and cooperation between Defendants. The boycott would only work if each Manufacturer Defendant agreed to the plan, otherwise one Manufacturer Defendant breaking with the boycott could have established itself as the

primary supplier to online sales platforms and grown its customer base by operating a new distribution channel for Crop Inputs, taking market share from its rival manufacturers.

96.     Third, Defendants had a strong motive to conspire to preserve the presently opaque market structure. If online sales platforms succeeded in publicly publishing price lists for Crop Inputs, then the Defendants could no longer keep prices confidential and charge varying prices based on geography or through seed relabeling or bundling. The Wholesaler and Retailer Defendants were therefore motivated to conspire amongst themselves and exert pressure on the Manufacturer Defendants to protect their profits without having to compete on the merits of price and services.

97.     Fourth, Defendants formed and maintained their conspiracy using a high degree of inter-firm communication both directly and through wholesalers and retailers, such as through CropLife America's annual board of directors meeting which specifically discussed the threat posed by the entry of online sales platforms. Because no farmer representatives are allowed to participate, these meetings provided a forum for collusion.

98.     Fifth, Defendants' actions were against their apparent economic self-interest. Providing Crop Inputs to online sales platforms presented a significant business opportunity because those platforms represented well-financed customers ready to purchase Crop Inputs in bulk quantity from a Manufacturer or Wholesaler Defendant, would simplify the distribution channel and permit Manufacturer Defendant to retain greater profit by eliminating transport costs, rebates, and incentive programs to wholesalers and retailers, and presented an opportunity for an individual Manufacturer

Defendant to increase profits by growing its market share through sales to farmers nationwide, not merely where its authorized retailers were located or enjoyed the largest market share within a specific geographic area.

99.     Sixth, Defendants are antitrust recidivists, which is probative of future collusion. *See*, *e.g.*, *In re Nat. Gas Commodity Litig.*, 337 F. Supp. 2d 498, 500-01 (S.D.N.Y. 2004). Competition experts have noted that past experience participating in cartels enables companies to spot opportunities to profitably engage in anticompetitive conduct while evading detection. Competition Policy International maintains a list of the "fifty-two leading recidivists," naming Defendants BASF and Bayer among the top five, and also listing Defendant Corteva.

100.    This conspiracy was a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

101.    Alternatively, this conspiracy was a "quick look" or rule of reason violation of Section 1 of the Sherman Antitrust Act. There is no legitimate business justification for, or procompetitive benefits attributable to, Defendants' conspiracy and overt acts in furtherance thereof. Any business justification or pro-competitive benefits proffered by Defendants would be pretextual, outweighed by the anticompetitive effects of Defendants' conduct, and, in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

102.    Plaintiff and the other members of the Classes have been injured, and will continue to be injured, in their business and property by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiff and members of the Classes

have paid more for Crop Inputs than they otherwise would have paid in the absence of Defendants' collusive conduct. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

103.   In formulating and effectuating this conspiracy, Defendants did those things that they combined and conspired to do, including agreeing to boycott online sales platforms, including FBN and AgVend, by refusing to supply Crop Inputs manufactured by Manufacturer Defendants to online sales platforms.

104.   The combination and conspiracy alleged herein has had the following effects, among others:

  a.   Price competition in the sale of Crop Inputs has been restrained, suppressed, and/or eliminated in the United States;

  b.   Prices for Crop Inputs sold by Defendants and all of their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels throughout the United States; and

  c.   Those who purchase Crop Inputs from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

105.   Plaintiff and Class members have been injured and will continue to be injured by paying more for Crop Inputs manufactured or sold by Defendants than they would have paid and will pay in the absence of the combination or conspiracy as alleged herein.

106.   Plaintiff and Class members are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## SECOND CLAIM FOR RELIEF
### Violation of the Minnesota Antitrust Statute

107.    Plaintiff incorporates and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

108.    During the Class Period, Defendants engaged in a continuing contract, combination, or conspiracy with respect to the sale of Crop Inputs in an unreasonable restraint of trade in commerce, in violation of state antitrust and consumer protection statutes.

109.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for Crop Inputs.

110.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated Class members who purchased Crop Inputs have been harmed by being forced to pay artificially inflated, supracompetitive prices for Crop Inputs.

111.    By engaging in the foregoing conduct, Defendants intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of state antitrust laws.

112.    Defendants have entered into an unlawful agreement in restraint of trade in violation of Minn. Stat. §§ 325D.51, *et seq.* with respect to purchases of Crop Inputs in Minnesota by Class members and/or purchases by Minnesota residents.

      a.    Defendants' combination or conspiracy had the following effects:

            (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Crop Inputs prices were

raised, fixed, maintained and stabilized at artificially high levels throughout Minnesota; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

b.     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

c.     As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minn. Stat. §§ 325D.51, *et seq*. Accordingly, members of the Classes seek all relief available under Minn. Stat. §§ 325D.51, *et seq.*

### THIRD CLAIM FOR RELIEF
### Violation of Minnesota Consumer Protection Statutes

113.   Plaintiff incorporates and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

114.   Defendants engaged in unfair competition, or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of Minnesota consumer protection and unfair competition statutes.

115.   Defendants have engaged in unfair competition or unfair, unconscionable, deceptive, or fraudulent acts or practices in violation of Minn. Stat. §§ 325F.68, *et seq.*,

and Minn. Stat. § 8.31 with respect to purchases of Crop Inputs in Minnesota by Class members and/or purchases by Minnesota residents.

    a.  Defendants' combination or conspiracy had the following effects: (1) Crop Inputs price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Crop Inputs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) members of the Classes were deprived of free and open competition; and (4) members of the Classes paid supracompetitive, artificially inflated prices for Crop Inputs.

    b.  During the Class Period, Defendants' illegal conduct had a substantial effect on Minnesota commerce.

    c.  As a direct and proximate result of Defendants' unlawful conduct, members of the Classes have been injured in their business and property and are threatened with further injury.

    d.  Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Minn. Stat. §§ 325F.68, *et seq.* and Minn. Stat. § 8.31, and, accordingly, members of the Classes seek all relief available under that statute.

116.   On behalf of himself and the Class, Plaintiff seeks all appropriate relief provided for under the foregoing statutes.

## FOURTH CLAIM FOR RELIEF
**Unjust Enrichment**

117.    Plaintiff incorporates and realleges each and every allegation in the preceding paragraphs as though fully set forth herein.

118.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on sales of Crop Inputs.

119.    Defendants have benefited from their unlawful acts and it would be inequitable under the unjust enrichment laws of the State of Minnesota for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff or the Class members for Crop Inputs.

120.    As a direct and proximate result of Defendants' conduct described above, Defendants have and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits from Defendants' sales of Crop Inputs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Classes of all others so similarly situated, respectfully requests judgment against Defendants as follows:

1.    That the Court determines that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representatives and its counsel of record as Class Counsel, and

direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes, once certified;

2.      That the unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed:

      a.   An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

      b.   A *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

      c.   An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust, unfair competition, and consumer protection laws as set forth herein; and

      d.   Acts of unjust enrichment by Defendants as set forth herein.

3.      That Plaintiff and the Classes recover damages, to the maximum extent allowed under the applicable state laws, and that a joint and several judgments in favor of Plaintiff and the members of the Classes be entered against Defendants in an amount to be trebled to the extent such laws permit;

4.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

5.      Plaintiff and the members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the Complaint;

6.      Plaintiff and the Class members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

7.      Plaintiff and the Class members have such other and further relief as the case may require and the Court deem just and proper.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, on all issues so triable.

Dated:  March 10, 2021                **CHESTNUT CAMBRONNE PA**

By /s/ Karl L. Cambronne
Karl L. Cambronne (#14321)
Bryan L. Bleichner (#0326689)
Jeffrey D. Bores (#227699)
Christopher P. Renz (#0313415)
100 Washington Avenue South, Suite 1700
Minneapolis, MN  55401
Phone:  612-339-7300

kcambronne@chestnutcambronne.com
bbleichner@chestnutcambronne.com
jbores@chestnutcambronne.com
crenz@chestnutcambronne.com

Wilbert B. Markovits (*pro hac vice*)
Terence R. Coates (*pro hac vice*)
**MARKOVITS, STOCK & DEMARCO, LLC**
3825 Edwards Road, Ste. 650
Cincinnati, OH 45209
Telephone No. (513) 651-3700
bmarkovits@msdlegal.com
tcoates@msdlegal.com


**ATTORNEYS FOR PLAINTIFF**